**MAYAGUEZANOS POR LA SALUD Y EL AMBIENTE, et al., Plaintiffs,**

**v.**

**UNITED STATES of America, et al., Defendants.**

**No. Civ. 98–1087(SEC).**

United States District Court, D. Puerto Rico.

Feb. 18, 1999.

Pedro J. Varela–Fernandez, Cayey, PR, for plaintiffs.

Stephen G. Bartell, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, DC, and Isabel Munoz–Acosta, U.S. Attorney's Office District of P.R., Civil Division, Hato Rey, PR, for defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Plaintiffs in this action are several organizations that advocate for the preservation of Puerto Rico's natural resources, as well as several fishermen associations. They are Mayagüezanos por la Salud y el Ambiente; Liga Ecológica Puertorriqueña del Noroeste, Inc.; Tourism Association of Rincón, Inc.; Asociación de Pescadores del El Maní; and Asociación de Pescadores de El Seco (hereinafter "plaintiffs")[1]. They are seeking injunctive relief against both federal government and industrial defendants pursuant to the National Environmental Policy Act of 1969 ("NEPA"); the Atomic Energy Act ("AEA"), and the Nuclear Non–Proliferation Act ("NNPA") to prevent industrial defendants from transporting vitrified nuclear waste through the waters of the Mona Passage off the coast of the Commonwealth of Puerto Rico without first preparing an Environmental Impact Statement ("EIS"). To that end, they are suing the United States of America; the State Department; the Department of Energy; the Coast Guard; Secretary of State Madeleine Albright; and Secretary of Energy Federico Peña (hereinafter the "federal defendants"). In addition, they are suing British Nuclear Fuels Limited ("BNFL"); Compagnie Generales de Matières ("COGEMA"); and Pacific Nuclear Transport Limited ("PNTL") (hereinafter the "industrial defendants"), the private entities in charge of transporting the vitrified nuclear waste at issue.

Pending before the Court are cross-motions for summary judgment filed by the federal defendants **(Docket # 16)** and plaintiffs **(Docket # 22)**, and the oppositions thereto. For the reasons stated below in this Opinion and Order, plaintiffs' motion for summary judgment **(Docket # 22)** is **DENIED** and the federal defendants' motion for summary judgment **(Docket # 16)** is **GRANTED.** The above-captioned action is therefore **DISMISSED.**

## Factual Background

Plaintiffs and federal defendants agree that there is no genuine issue of material fact and that thus this matter should be disposed of through the summary judgment mechanism. While there are disputes among the parties regarding the actual safety of the shipments at issue here, said controversy is not material to the disposition of the case. We shall thus limit the recounting of the facts to those that

---

1. In addition, the Nuclear Control Institute ("NCI"), was granted leave of Court to file an *amicus curiae* brief in support of plaintiffs' request for an injunction in the present case **(Docket # 4).** NCI is a non-profit, educational corporation based in the District of Columbia which "is actively engaged in disseminating information to the public concerning the proliferation, safety and environmental risks attendant upon the use of sensitive nuclear materials, equipment, and technology." **(Id.** **at 2).** In brief, NCI echoes plaintiffs' argument that the shipments at issue in this case violate the consent transfer provisions of the AEA, the NNPA and the U.S.–EURATOM Agreement and are thus contrary to law. We shall thus address NCI's arguments *infra* in our discussion of the applicability of said statutes.

are relevant to the resolution of the questions of law that have been raised by the parties.

On January 21, 1998, the Pacific Swan, a British-flag freighter, left the French port of Cherbourg bound for Japan with a cargo of vitrified high-level radioactive waste. This waste being shipped to Japan is residue from reprocessed or "spent" nuclear reactor fuel; it contains only trace amounts of irrecoverable uranium and plutonium. On its way to the Panama Canal, on February 3, 1998, the Pacific Swan crossed the Mona Passage off the coast of Puerto Rico, which brought it within 200 miles of the north and west coasts of Puerto Rico.

The shipment at issue was the third in a series of oceanic shipments of this type from either France or England to Japan that are a result of spent nuclear fuel reprocessing process used by the Japanese electric utilities. The reprocessing contracts are between COGEMA in France, BNFL in the United Kingdom, and various Japanese utilities.

The uranium which was manufactured into the original power reactor fuel was supplied to Japan by the United States pursuant to the Agreement for Cooperation Between the United States of America and Japan Concerning Peaceful Uses of Nuclear Energy (the "U.S.–Japan Agreement"), entered into force on July 17, 1988. U.S.–Japan Agreement, 1988 WL 582501, H.R.Doc. No. 128, 100th Cong., 1st Sess., Nov. 9, 1987. The United States, however, plays no role in either the reprocessing process or the return of the vitrified nuclear waste to Japan.

The shipments at issue follow one of three possible routes: around Cape Horn; around the Cape of Good Hope; or via the Panama Canal. The route is selected solely by the shipping companies and the receiving country. While the Pacific Swan shipment was the first one of this particular type of nuclear waste to transit through the Panama Canal, there have been more than 150 shipments of spent fuel from Japan to Europe over the last twenty years, including numerous ones through the Panama Canal. There has also been a smaller number of plutonium and waste shipments; in all that time, there has not been a single incident involving the release of radioactivity.

In the process of reprocessing the spent fuel, a series of mechanical and chemical operations take place in order to settle out selectively the various components of the spent nuclear fuel and thus recover a majority of the unused fissionable material in the spent fuel. Among this recovered fissionable material are isotopes of plutonium and uranium; the remaining material is waste for which there is no use. As stated above, the cargo shipments involved in this case involve only this waste residue.

The waste residue is radioactive and is returned to the owner of the spent nuclear fuel, in this case Japan, for proper storage and disposal. To ensure the safe storage and handling of this radioactive waste, the waste is "vitrified," that is, turned into solid glass form, making the waste an integral part of the glass matrix and immobilizing the radioactive material within it. The molten glass is poured into stainless steel canisters, where the glass solidifies; the canisters are then welded shut. France, Japan, Germany, Belgium, Switzerland, and the Netherlands all follow this same practice of reprocessing their spent nuclear fuel.

The stainless steel canisters are loaded into specially-designed casks known as TN 28 VT's, which hold either 20 or 28 containers each. For example, the Pacific Swan shipment consisted of three of these casks, each holding 20 canisters. These casks are massive steel structures made from 10–inch forged steel, weighing about 100 metric tons each. They are certified to meet the safety standards of the International Atomic Energy Agency ("IAEA"), Japan, and France for structural integrity, thermal performance, containment level, and shielding capacity. In addition, they

comply with the stringent IAEA "Type B" specifications for the transport of radioactive materials and are also known as "accident resistant" casks, for their purported ability to withstand a range of severe accidents.

These casks are loaded on specially-designed ships which are used only for the transport of nuclear materials; these ships are owned by "PNTL", a subsidiary owned by BNFL, COGEMA, and the Japanese electric utilities. These ships meet the international standards of the International Maritime Organization ("IMO"), as well as the requirements of the Japanese, French, and British authorities. Furthermore, all PNTL-operated vessels meet the standards of the Irradiated Nuclear Fuel ("INF") Code, established by the IMO, which recommends a range of requirements for the design and operation of vessels carrying nuclear materials. In short, both the ships and the casks meet all internationally-set standards for the storage and transportation of radioactive materials of this kind.

### Summary Judgment Standard

As noted by the First Circuit,

[s]ummary judgment has a special niche in civil litigation. Its role is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir. 1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to husband scarce judicial resources.

*McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

According to Fed.R.Civ.P. 56(c), a summary judgment motion should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28 (1st Cir.1994). It is not enough to conjure up an alleged factual dispute between the parties; to defeat summary judgment, there must exist a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Having filed cross-motions for summary judgment, parties agree that this case is ripe for summary disposition. We must thus determine whether either party is entitled to judgment as a matter of law pursuant to Rule 56(c).

### Applicability of the U.S.–EURATOM Agreement, the AEA, and the NNPA

Plaintiffs argue that the Court has jurisdiction to enjoin the passage of the vitrified nuclear waste at issue here because said material is subject to the transfer requirements contained in the Atomic Energy Act (the "AEA"), 42 U.S.C. § 2011, et seq.; the Nuclear Non–Proliferation Act (the "NNPA"), 22 U.S.C. § 3201, et seq.; and the Agreement for Cooperation in the Peaceful Uses of Nuclear Energy between the United States of America and the European Atomic Energy Community (EURATOM) (the "U.S.–EURATOM Agreement"), 1996 WL 361511.

In their complaint, plaintiffs aver that the United States needs to consent to the retransfer of the waste material from Europe to Japan under the terms of the U.S.–EURATOM Agreement and that in order for that consent to be operative, the United States needs to designate a list of countries eligible to receive the transferred material. They further argue that "[n]o list has been developed to date, and therefore there is no operative U.S. authorization for the retransfer of 'irradiated nuclear material' from EURATOM to third countries such as Japan." (**Docket # 1, at page 16**). As such, they claim that this radioactive waste is material that is sub-

ject to the consent rights regime established by the United States under Sections 123, 127, and 131 of the AEA and the terms of the U.S.–EURATOM Agreement and the NNPA. Since no consent has been given, plaintiffs claim that the retransfer of this material should be enjoined as it is in violation of the relevant statutes and the U.S.–EURATOM Agreement.

Defendants counter this position, arguing that the radioactive waste involved here is not subject to Article 8.1(c)(ii) of the U.S.–EURATOM Agreement which covers "retransfer to third countries ... of irradiated nuclear material transferred pursuant to this Agreement ..." 1996 WL 361511 at 8. They argue that the waste material involved in these shipments is not subject to the requirements of the U.S.–EURATOM Agreement because it is specifically excluded under the terms of Article 5.2 of the same, which states in pertinent part: "Non-nuclear material, nuclear material and equipment referred to in this Article shall remain subject to the provisions of this Agreement until it has been determined, in accordance with the procedures set out in the Administrative Arrangement ... that nuclear material or non-nuclear material are no longer usable for any nuclear activity relevant from the point of view of international safeguards *or has become practically irrecoverable ...*" *Id.* at 6.

As contained in the terms of Article 5.2 of the U.S.–EURATOM Agreement, the procedures to remove material from the coverage of the Agreement are set out in the Administrative Arrangement. As proffered by federal defendants, said "Administrative Arrangement" was concluded on January 28, 1997 by the Department of Energy on behalf of the United States, and the European Commission on behalf of EURATOM, pursuant to the set of procedures established by Article 16 of the U.S.–EURATOM Agreement. Paragraph 4.1 of the Administrative Arrangement states that "[t]he Commission and DOE will each establish and maintain an inven-

tory of nuclear material ... within its respective jurisdiction subject to the Agreement ..." Paragraph 4.3 of the Administrative Arrangement states that nuclear material, *inter alia,* shall remain listed in the inventory and thus subject to the Agreement "until a determination has been made" that the. criteria for removal specified by Article 5.2 of the U.S.–EURATOM Agreement have been met.

Defendants assert that the only procedure necessary to bring about said removal from the inventory list is that the determination "shall be made by the appropriate authority of the Party holding the item subject to the Agreement before removal, and will be the same determination as made for the purposes of an agreement with the IAEA, where applicable." As such, defendants argue, "it is apparent that the United States was not required to take any action to implement Article 5.2 of the Agreement with respect to the waste shipments at issue here, and in fact took no action. All that was required was that *EURATOM make the determination* that the residue of nuclear material contained in the waste 'was no longer usable for any nuclear activity relevant from the point of view of international safeguards or [had] become practically irrecoverable.' " (**Federal Defendants' Reply Memorandum and Response to Plaintiffs' Cross–Motion for Summary Judgment, at 18**).

Defendants add that the IAEA terminates its safeguards on the trace amounts of plutonium and uranium contained in the waste at issue here because these trace amounts are determined to be practically irrecoverable and are no longer usable for any nuclear activity relevant from the point of view of international safeguards. They attach a letter dated January 13, 1995 from Bruno Pellaud, Deputy Director General for Safeguards of the IAEA, to Nobutoshi Akao, Resident Representative of Japan to the IAEA, stating that "the vitrified waste which contains nuclear material that has become practically irrecov-

erable will be shipped from France and enter Japan as material not subject to Agency [IAEA] safeguards ..." *Id.,* Exhibit 2.

Furthermore, defendants assert that the material at issue is not subject to the provisions of either the AEA or the NNPA. They argue that the AEA and/or the NNPA does *not* provide that all U.S.-obligated special nuclear material (such as plutonium), no matter how small the quantity and no matter what the physical form, must, when outside the United States, be subject to a section 123 agreement for peaceful nuclear cooperation.

■ The Supreme Court has stated that the AEA "grew out of Congress' determination that the national interest would be best served if the Government encouraged the private sector to become involved in the development of atomic energy for peaceful purposes under a program of federal regulation and licensing." *Pacific Gas and Electric Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190, 206, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). In turn, the subsequent amendments through the NNPA "confirmed [Congress'] intention that assurances of nonproliferation and maintenance of the military balance be the indispensable conditions of United States nuclear exporting." *Natural Resources Defense Council, Inc. v. Nuclear Regulatory Comm'n,* 647 F.2d 1345, 1359 (D.C.Cir.1981). Because the aim of these two statutes is to prevent proliferation in order to protect the national security interests of the United States, defendants argue that holding material that is clearly irrecoverable and thus irrelevant from a non-proliferation standpoint as subject to the AEA or the NNPA would be contrary to congressional intent and is not warranted by the statutes.

It is clear to the Court that the vitrified nuclear waste at issue in this case is not subject either to the retransfer provisions of the U.S.–EURATOM Agreement or the AEA and NNPA. As to the first, the Court

agrees with defendants that it is not within the control of the United States to make the determination that certain material is no longer subject to the retransfer provisions of the Agreement. Furthermore, it is also clear that this material has been determined by the IAEA to be "practically irrecoverable" and thus no longer subject to the stringent IAEA standards for nuclear material. Thus, this material is clearly outside of the scope of Article 8.1(c)(ii) of the U.S.–EURATOM Agreement and as such, this provision may not be utilized to enjoin these shipments.

■ Regarding the applicability of the AEA and the NNPA, it is also clear to the Court that material such as that involved in the present case is insignificant for proliferation purposes and that subjecting it to a Section 123 agreement for peaceful nuclear cooperation would run contrary to the clear congressional intent evidenced in both statutes. Thus, the United States is under no obligation under either the AEA or the NNPA to enter into a Section 123 agreement before allowing the transport of this type of nuclear waste to be returned to Japan for disposal and storage. The AEA and the NNPA do not provide plaintiffs with a cause of action in this instance as they are not applicable to the vitrified nuclear waste at issue here.

**Applicable Law: NEPA's "major Federal action" requirement**

■ NEPA requires federal agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA's requirements, among them, the preparation and submission of an EIS, only apply "when the federal government's involvement in a project is sufficient to constitute 'major federal action.'" *Save Barton Creek Ass'n v. Federal Highway Administration,* 950 F.2d 1129, 1133 (5th Cir.1992). The Council on Environmental Quality ("CEQ"), the agency entrusted with the promulgation of reg-

ulations pursuant to NEPA, has defined "major Federal action" under NEPA "as includ[ing] actions with effects that may be major *and which are potentially subject to Federal control and responsibility.*" 40 C.F.R. § 1508.18, *emphasis added.*

■ The purpose behind the enactment of NEPA was to ensure "that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). "The EIS is supposed to inform the decision-maker. This presupposes that he has judgment to exercise. *Cases finding 'federal' action emphasize authority to exercise discretion over the outcome.*" W. Rodgers, *Environmental Law* 763 (1977), *quoted in Sierra Club v. Hodel,* 848 F.2d 1068, 1089, *overr'd on other gds, Village of Los Ranchos de Albuquerque v. Marsh,* 956 F.2d 970 (10th Cir.1992), emphasis added. The First Circuit has decided accordingly, holding in *Milo Community Hosp. v. Weinberger,* 525 F.2d 144, 147 (1st Cir.1975), that preparation of an EIS was not required where "consideration of the factors that the appellant has characterized as 'environmental considerations' could not have changed the Secretary's decision."

In turn, the Ninth Circuit, in deciding the threshold issue of NEPA applicability, has stated that "the key to determining whether there [is] major federal action [is] the extent of the federal involvement." *Ramsey v. Kantor,* 96 F.3d 434, 443 (9th Cir.1996). The Eighth Circuit has stated that in order to determine whether an action is "federal" under NEPA, courts must look at whether an agency has "legal or factual control" over the project. *Goos,* 911 F.2d at 1294. Expounding upon said standard, the Court held that "[i]n deciding whether a federal agency exercises legal control, we must consider whether some federal action 'is a legal condition precedent to accomplishment of an entire nonfederal project.'" *Id., quoting Winnebago Tribe v. Ray,* 621 F.2d 269, 272 (8th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980).

Finally, in a case factually analogous to the one at hand, the Third Circuit held that the U.S. Coast Guard did not have to prepare an EIS before a power authority could begin shipments of irradiated fuel because its "approval was not required before the shipments could take place, so the Coast Guard did not have control over them." *State of New Jersey, Dep't of Environmental Protection and Energy v. Long Island Power Authority,* 30 F.3d 403, 418 (3d Cir.1994). It further stated that "[t]he Coast Guard did not, therefore, perform a major federal action in relation to the shipments, and was not obligated to analyze their environmental impact under NEPA." *Id.*[2]

2. In their briefs in favor of their motion for summary judgments, plaintiffs cite several cases to support their position that NEPA requires that the Federal Government prepare an EIS before these shipments of vitrified nuclear waste can pass through the Exclusive Economic Zone ("EEZ") of the United States. Among said cases, plaintiffs cite *Save Barton Creek Ass'n, supra,* and *Ramsey v. Kantor, supra,* to support their assertion that non-federal actors can be enjoined under NEPA. While this is certainly true, those cases stand for the proposition that non-federal actors can be enjoined under NEPA when action by a federal agency is required for the purported non-federal project to go forward, thus implicating major agency action. In fact, in those cases the Fifth Circuit and the Ninth Circuit, respectively, emphasize that the purpose of NEPA is to ensure that federal decisionmakers evaluate the environmental consequences of their actions before proceeding. If no federal action is involved, then NEPA is clearly inapplicable. Furthermore, plaintiffs' reliance on *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n,* 59 F.3d 284 (1st Cir.1995), and *Environmental Defense Fund v. Massey,* 986 F.2d 528 (D.C.Cir.1993), is also inapposite. In both those cases, there was a clear regulatory scheme in place that governed agency action, and the Court's decisions regarding NEPA's applicability clearly depend on the presence of *agency* action, rather than the presence of private action. Therefore, it is clear that while NEPA may be

We must thus address whether the United States has the discretion under international law to allow or disallow these shipments of vitrified nuclear waste through its Exclusive Economic Zone ("EEZ"). If we find, under the applicable law, that the United States government has no discretion to either allow or prohibit the shipments at issue, then we must clearly hold that there is no "major Federal action" and that NEPA is inapplicable in the instant case.

**Applicable Law: UNCLOS III, the creation of the EEZ, and the powers of the coastal State to regulate transit**

The 1982 United Nations Convention on the Law of the Sea ("UNCLOS III") came into force on November 16, 1994, six months after sixty-one, non-industrialized countries ratified the treaty. On October 7, 1994 the President of the United States transmitted the treaty to the Senate for its advice and consent to accession to the same. S.Con.Res. 72, 103d Cong., 2d Sess. (1994), 1992 WL 725344.[3]

UNCLOS III divides the oceans into five major jurisdictional zones: the territorial sea; the contiguous zone; the EEZ; the continental shelf; and the high seas. "From the absolute sovereignty that every State exercises over its land territory and superjacent airspace, the exclusive rights and control that the coastal State exercises over maritime areas off its coast diminish in stages as the distance from the coastal State increases. Conversely, the rights and freedoms of maritime States are at their maximum in regard to activities on the high seas and gradually diminish closer to the coastal State." Commentary on the 1982 United Nations Convention on the Law of the Sea and the Agreement on Implementation of Part XI (accompanying the President's Letter of Transmittal), Treaty Doc. 103–39, 103d Cong., 2d Sess., at 9 (1994) (hereinafter "UNCLOS III Commentary").

Article 3 of UNCLOS III states that "[e]very State has the right to establish the breadth of its territorial sea up to a limit not exceeding 12 nautical miles ..." In the territorial sea, the coastal State has sovereignty over the water column, the air space above the territorial sea, as well as its bed and subsoil. UNCLOS III, Article 2. The primary limitation on the coastal State's sovereignty within the territorial sea is that of the *right of innocent passage*. UNCLOS III, Article 17. The right of innocent passage—that is, the right of other countries to engage in navigation or overflight in a coastal State's territorial sea—is defined as that passage which "is not prejudicial to the peace, good order or security of the coastal State." UNCLOS III, Article 19.[4]

utilized to enjoin the actions of private actors, it is only when said actions are dependent upon agency action or approval that NEPA is triggered.

3. The Senate has yet to ratify UNCLOS III. However, pending ratification or rejection by the Senate, "the United States is bound to uphold the purpose and principles of the agreement to which the executive branch has tentatively made the United States a party." *United States of America v. Royal Caribbean Cruises, Ltd.*, 24 F.Supp.2d 155, 159 (D.P.R. 1997). Furthermore, there is a consensus among commentators that the provisions contained in UNCLOS III reflect customary international law and are thus binding on the United States, as well as all other nations, signatory or non-signatory. *See, e.g.*, Carol Elizabeth Remy, *Note: U.S. Territorial Sea Extensions: Jurisdiction and International En-*

*vironmental Protection*, 16 Fordham Int'l L.J. 1208, 1211–12 (1993).

4. Article 19(2) of UNCLOS III contains an *exhaustive* list of the actions undertaken by a foreign ship that would violate the principle of innocent passage. These are as follows:

(a) any threat or use of force against the sovereignty, territorial integrity or political independence of the coastal State, or in any other manner in violation of the principle of international law embodied in the Charter of the United Nations;

(b) any exercise or practice with weapons of any kind;

(c) any act claimed at collecting information to the prejudice of the defense, or security of the coastal State;

(d) any act of propaganda aimed at affecting the defence or security of the coastal State;

Article 22 prescribes the measures that may be taken by a coastal State to ensure the safety of navigation of ships exercising the right of innocent passage, which is limited to the establishment of sea lanes and traffic separation schemes.[5] Section 2 of said article specifically provides that "tankers, nuclear-powered ships and ships carrying nuclear or other inherently dangerous or noxious substances or materials may be required to confine their passage to such sea lanes." UNCLOS III, Article 22(2). Furthermore, Article 23 provides that "[f]oreign nuclear-powered ships and ships carrying nuclear or other inherently dangerous or noxious substances shall, when exercising the right of innocent passage through the territorial sea, carry documents and observe special precautionary measures established for such ships by international agreements." UNCLOS III, Article 23.

In turn, UNCLOS III provides that "[t]he contiguous zone may not extend beyond 24 nautical miles from the baselines from which the breadth of the territorial sea is measured." UNCLOS III, Article 33. In the "contiguous zone", a coastal State "may exercise the control necessary to . . . prevent infringement of its customs, fiscal, immigration or sanitary laws and regulations within its territory or territorial sea."

The EEZ is an area that extends from twelve miles to a maximum of two hundred miles from the coastline. "The coastal State does not have sovereignty over the EEZ, and all states enjoy the high seas freedoms of navigation, overflight, laying and maintenance of submarine cables and pipelines, and related uses in the EEZ, compatible with other Convention provisions." UNCLOS III Commentary, at 11[6] (referring to Article 58 of UNCLOS III). Thus, the rights ascribed to coastal States

---

(e) the launching, landing or taking on board of any aircraft;
(f) the launching, landing or taking on board of any military device;
(g) the loading or unloading of any commodity, currency or person contrary to the customs, fiscal, immigration or sanitary laws and regulations of the coastal State;
(h) any act of *willful and serious pollution* contrary to this Convention;
(i) any fishing activities;
(j) the carrying out of research or survey activities;
(k) any act aimed at interfering with any systems of communication or any other facilities or installations of the coastal State;
(*l*) any other activity not having a direct bearing on passage.
UNCLOS III, Article 19(2), emphasis added. Article 1 of UNCLOS III defines "pollution of the marine environment" as "the introduction by man, directly or indirectly, of substances or energy into the marine environment, including estuaries, which results or is likely to result in such deleterious effects as harm to living resources and marine life, hazards to human health, hindrance to marine activities, including fishing and other legitimate uses of the sea, impairment of quality for use of sea water and reduction of amenities." UNCLOS III, Article 1.

5. Article 22 of UNCLOS III provides in pertinent part: "The coastal State may, where

necessary having regard to the safety of navigation, require foreign ships exercising the right of innocent passage through its territorial sea to use such sea lanes and traffic separation schemes as it may designate or prescribe for the regulation of the passage of ships."

6. Article 56 of UNCLOS III prescribes the coastal State's rights in the EEZ. It provides: "In the [EEZ], the coastal State has:

(a) sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources, whether living or nonliving, of the waters superjacent to the seabed and its subsoil, and with regard to other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents, and winds;
(b) jurisdiction as provided for in the relevant provisions of the Convention with regard to: (i) the establishment and use of artificial islands, installations and structures; (ii) marine scientific research; (iii) the protection and preservation of the marine environment;
(c) other rights and duties as provided for in this Convention." Section 2 of Article 56 adds: "In exercising its rights and performing its duties under this Convention in the [EEZ], the coastal State shall have due regard to the rights and duties of other States and shall act in a manner compatible with the provisions of this Convention."

in Article 56 are limited in their scope by the rights ascribed to foreign ships that desire to transit through a coastal State's EEZ. This is clear in the plain language of Article 58 [7] and is further explained in the Commentary to UNCLOS III: "The terms 'sovereign rights' and 'jurisdiction' are used to denote functional rights and do not imply sovereignty. A claim of sovereignty in the EEZ would be contradicted by the language of Articles 55 and 56 and precluded by Article 58 and the provisions it incorporates by reference." UNCLOS III Commentary, at 28.

The fourth zone in which the oceans are divided by UNCLOS III is the continental shelf, which is comprised of the sea-bed and subsoil of the submarine areas that extend beyond the territorial sea to the outer edge of the continental margin; the maximum distance is three hundred and fifty miles. UNCLOS III, Article 76. The coastal State enjoys exclusive sovereign rights over the continental shelf for the purpose of exploring it and exploiting its natural resources. UNCLOS III, Article 77. The fifth division of the oceans is the high seas, which is defined as all other parts of the sea that are not included in the EEZ, or the territorial sea or internal waters of a state. UNCLOS III, Article 86. In the high seas, all States enjoy freedom of navigation, overflight, placement of submarine cables and pipelines, construction of artificial islands and other structures permitted by international law, fishing, and scientific research. UNCLOS III, Article 86.

Article 194 of UNCLOS III provides that "States shall take, individually or jointly as appropriate, all measures consistent with this Convention that are necessary to prevent, reduce and control pollution of the marine environment from any source, using for this purpose the best practicable means at their disposal and in accordance with their capabilities, and they shall endeavour to harmonize their policies in this connection." UNCLOS III, Article 194(1). That same article, however, also clearly states that "[i]n taking measures to prevent, reduce or control pollution of the marine environment, States shall refrain from unjustifiable interference with activities carried out by other States in the exercise of their rights and in pursuance of their duties in conformity with this Convention." UNCLOS III, Article 194(4).[8]

This tension between the rights of coastal States to exploit and preserve the natural resources within its territorial waters and EEZ, and the rights of foreign ships to engage in innocent passage through these areas, is evident throughout the entire text of the treaty. However, while it is evident that UNCLOS III seeks to ensure that coastal States have some measure of control over their EEZs, it is also evident that the balance reached throughout the treaty seeks to always protect the integrity of the principle of innocent passage, regardless of the cargo involved, as long as the ships are complying with the applicable international standards and reg-

---

7. Article 58 of UNCLOS III states in pertinent part: "In the [EEZ], all States, whether coastal or land-locked, enjoy, subject to the relevant provisions of this Convention, the freedoms referred to in article 87 of navigation and overflight and of the laying of submarine cables and pipelines, and other internationally lawful uses of the sea related to these freedoms, such as those associated with the operation of ships, aircraft and submarine cables and pipelines, and compatible with the other provisions of this Convention."

8. This limitation on the rights of coastal States to regulate the transit of ships through its EEZ has led one commentator to note that "the coastal state's ability to control pollution in the EEZ is limited. A coastal state is precluded from enacting legislation that includes greater restrictions or requirements than existing international minimum standards. The coastal state may not impose design, construction or equipment standards on vessels." Amy DeGeneres Berrett, *UNCLOS III: Pollution Control in the Exclusive Economic Zone*, 55 La.L.Rev. 1165, 1174 (1995). *See also* Eugene R. Fidell, *Maritime Transportation of Plutonium and Spent Nuclear Fuel*, 31 Int'l Law. 757 (1997) (arguing that UNCLOS III does not allow states to unilaterally restrict passage of ships carrying spent nuclear fuel).

ulations for the shipment of said cargo[9]. To that effect, another commentator has noted:

> Subject to Article 23, states may enact laws that could regulate passage of vessels carrying hazardous cargoes within the territorial sea. These laws may not, however, deny the right of innocent passage. Regulating states could argue that the transportation of such a hazardous cargo could itself qualify as noninnocent passage under the terms of article 19. Although the environmental risk of such a voyage may be high, UNCLOS only recognizes a voyage to be noninnocent if an "act of willful or serious pollution contrary to this Convention" occurs. UNCLOS, therefore, does not allow for a proactive suspension of passage because of the risk of pollution. Indeed, article 23 clearly anticipates that vessels carrying noxious substances can engage in innocent passage.

Donald R. Rothwell, *Navigational Rights and Freedoms in the Asia Pacific Following Entry Into Force of the Law of the Sea Convention,* 35 Va.J. Int'l L. 587, 615–16 (1995).

### Analysis: Whether transit through the U.S. EEZ triggers NEPA's EIS requirement

In their motion for summary judgment, plaintiffs argue that the United States must prepare an EIS before this type of shipment may pass through the U.S. EEZ because "there is no unrestricted freedom of the seas when ships transversing [sic] an EEZ represent an environmental threat to the coastal state and/or its EEZ." **(Docket # 21, at page 21).** While they recognize that agency action is necessary to trigger NEPA's EIS requirements, *Id.* at 47, they argue that the level of risk associated with the shipments at hand is so high that it creates an *ipso facto* duty for the United States to intervene with these shipments. Plaintiffs misunderstand the nature and purpose of NEPA, as well as its interaction with international law. The level of risk associated with an activity has no bearing on the determination whether there is "major federal action" that would force the government to prepare an EIS.[10] As discussed above, a private project would become "federal" in nature and thus require the preparation of an EIS pursuant to NEPA only if an agency of the federal government had discretion or authority to allow or disallow these shipments from transiting through the United States' territorial waters or EEZ.

Furthermore, the right of innocent passage embodied in UNCLOS III is one of

---

9. One commentator has written on this tension within the provisions of the Convention, and of the balance that is stricken in favor of maritime interests within the EEZ: "Although the Convention's provisions on the EEZ, like those on the territorial sea, set up a basic tension between a coastal state's right to protect its marine environment and a maritime state's right to freedom of navigation, the balance weighs more heavily in favor of maritime interests in the EEZ than in the territorial sea.. Thus, article 211(5) contains a much more definite rule designed to protect navigation rights in the EEZ; it permits a coastal state to adopt only those laws that 'conform and give effect' to generally accepted international rules and standards for the prevention, reduction, and control of pollution from vessels. Based on the principle that the more specific part of an agreement governs over the more general, this specific provision relating to pollution control measures in the EEZ would appear to inform and limit the more general provisions on the EEZ and thereby preclude coastal states from adopting national standards." Daniel Bodansky, *Protecting the Marine Environment From Vessel–Source Pollution: UNCLOS III And Beyond,* 18 Ecology L.Q. 719, 765–66 (1991).

10. The two cases cited by plaintiffs to support their argument that the level of risk associated with a project is sufficient to trigger the application of NEPA, *Public Service Co. of Colorado v. Andrus,* 825 F.Supp. 1483 (D.Id. 1993), *aff'd sub. nom,* 67 F.3d 234 (9th Cir. 1995), and *Oregon Natural Desert Ass'n v. Green,* 953 F.Supp. 1133 (D.Or.1997), are inapplicable to the situation at hand insofar as they both clearly involved the applicability of NEPA to actions undertaken by federal agencies, rather than private actors.

the *bedrock principles of the law of the sea.*[11] UNCLOS III clearly states that ships enjoy the right of innocent passage, even through a coastal State's territorial sea. As a coastal State's interests diminish the farther away a foreign ship is from its coast, as discussed above, it is clear that the right of innocent passage is protected in a coastal state's EEZ. The right of innocent passage is not extinguished by the type of cargo that a ship is carrying; a ship's passage would only become noninnocent in this type of scenario if there is "an act of *wilful and serious pollution* ", which is not the case here. UNCLOS III clearly limits the scenarios where a coastal State may interfere with the passage of a ship, either through its territorial sea or its EEZ, to those instances where there has been a violation of the applicable international rules and standards for the prevention and reduction of pollution[12] *and* where that violation has resulted in a discharge causing or threatening major damage to the coastal State's environment. *See* UNCLOS III, Article 220(6). Since neither of those two scenarios applies to these shipments, the right of innocent passage is not extinguished and the United States may not intervene with the passage of these ships in any way.

It is clear that pursuant to established principles of international law, the United States may not interfere with the transit of ships carrying vitrified nuclear waste through either its territorial waters or its EEZ as long as said ships are in compliance with the provisions of UNCLOS III discussed above, as well as all applicable international regulations. The limited scenario in which UNCLOS III permits the intervention by a coastal State with a foreign ship transiting through its territorial waters or EEZ is not present here. Because the United States has no discretion whether to allow or prohibit the passage of the ships at issue here, it is clear that there is no "major Federal action" that would trigger NEPA's application and thus the preparation of an EIS. NEPA is clearly inapplicable and does not provide plaintiffs with a cause of action for enjoining the shipments in question.

## Conclusion

Pursuant to the above discussion, plaintiffs' motion for summary judgment **(Docket # 22)** is **DENIED** and the federal defendants' motion for summary judgment **(Docket # 16)** is **GRANTED**. The above-captioned action is therefore **DISMISSED**[13]. Judgment will be entered accordingly.

### SO ORDERED.

---

11. The right of innocent passage has long been recognized in international law, as well as by the United States Supreme Court. *See, e.g., Manchester v. Commonwealth of Massachusetts,* 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891); *United States v. Lousiana, Texas, Mississippi, Alabama, and Florida,* 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960); *United States v. Louisiana,* 394 U.S. 11, 89 S.Ct. 773, 22 L.Ed.2d 44 (1969). For a historical overview of the development of the doctrine of the right of innocent passage in international law, *see* 1 D.P. O'CONNELL, THE INTERNATIONAL LAW OF THE SEA 259–98 (1982).

12. All evidence that has been brought before the Court indicates that industrial defendants are in full compliance with all applicable IMO and IAEA standards and regulations for the transportation of radioactive materials.

13. This dismissal pertains to the entire action, including all of plaintiffs' claims against the industrial defendants, which are clearly derivative of plaintiffs' claims against the federal defendants as they are pursuant to the same statutes and causes of action.