<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 99-1412

       MAYAGUEZANOS POR LA SALUD Y EL AMBIENTE, ET AL.,

                    Plaintiffs, Appellants,

                               v.

               UNITED STATES OF AMERICA, ET AL.,

                     Defendants, Appellees.
                                 

                      ____________________

                
          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

        [Hon. Salvador E. Casellas, U.S. District Judge]

                      ____________________
                     
                             Before

                    Lynch, Circuit Judge,
               Campbell, Senior Circuit Judge,
                 and O'Toole, District Judge.
                                
                      ____________________

 Juan A. Giusti-Cordero, with whom Pedro J. Varela-
Fernandez was on brief, for appellants.
 Sean H. Donahue, Attorney, Environmental and Natural
Resources Division, U.S. Department of Justice, with whom Janet
Masters, Trial Attorney, Office of General Counsel, U.S. Department
of Energy; Horst Greczmiel, Office of Environmental Law, United
States Coast Guard; James F. Simon, Acting Assistant Attorney
General, Environmental and Natural Resources Division, U.S.
Department of Justice; Guillermo Gil, United States Attorney,
Isabel Munoz Acosta, Assistant United States Attorney; Ellen
Durkee, John T. Stahr, and Stephen G. Bartell, Attorneys, U.S.
Department of Justice, were on brief, for appellees.

                      ____________________
                     
                       December 20, 1999
                      ____________________

 LYNCH, Circuit Judge. On February 3, 1998, the Pacific
Swan, a British-flag freighter carrying a cargo of vitrified high-
level nuclear waste, passed through the Mona Passage, a stretch of
seas between the islands of Puerto Rico and Hispaniola. It was
bound for Japan, by way of the Panama Canal, from France. A day
earlier, a group of fishermen and environmental organizations from
western Puerto Rico, fearing an accident or maritime disaster,
brought this action for an injunction to stop the shipment until
the United States filed an Environmental Impact Statement (EIS) in
accordance with the National Environmental Policy Act (NEPA), 42
U.S.C.  4321 et seq. After the parties filed cross-motions for
summary judgment, the district court denied the claim for
injunctive relief and dismissed the action. See Mayagezanos por la
Salud y el Ambiente v. United States, 38 F. Supp. 2d 168, 178
(D.P.R. 1999). We affirm on different reasoning.

                              I
 The voyage of the Pacific Swan is part of a modern
circumferential trade. Uranium from the United States is sent to
Japan to fuel nuclear energy reactors. Japan ships the reactors'
spent fuel to COGEMA, a French nuclear power company, for recycling
at its La Hague plant. This process recovers a substantial portion
of reusable fissionable material, which is turned into nuclear fuel
(either RepU fuel, comprising uranium, or MOX fuel, comprising
plutonium and uranium). It also generates high-level nuclear waste,
which includes trace amounts of uranium and plutonium. The waste is
vitrified according to specifications that have been approved by
French and Japanese governments and placed in casks that meet
criteria set forth by the International Atomic Energy Agency in its
Regulations for the Safe Transport of Radioactive Material. Both
the waste and the fuel are returned to Japan on board specially
designed ships that meet the standards of the International
Maritime Organization's Code for the Safe Carriage of Irradiated
Nuclear Fuel, Plutonium and High-Level Radioactive Wastes in Flasks
on Board Ships, IMO Resolution A 18/Res. 748, Annex (1993). The
private shippers choose the return route to Japan from three
options: the Cape of Good Hope, Cape Horn, or the Panama Canal.
 The U.S. connection to this trade occurs in two ways.
First, the United States supplies the uranium to Japan under a 1988
agreement between the two countries. See Agreement for Cooperation
Between the Government of the United States and the Government of
Japan Concerning Peaceful Uses of Nuclear Energy, Nov. 4, 1987,
H.R. Doc. No. 100-128 (1987) (entered into force July 17, 1988),
available at 1988 WL 582501 at *3 ("U.S.-Japan Agreement"). Second,
the transport of the nuclear waste shipments through the Mona
Passage means that the ship traverses waters in which the United
States has some interest, even if they are not territorial waters.

                               II
 Because these waste-laden voyages through the Mona
Passage continue, the case is not moot, which the United States
appropriately concedes. See Lewis v. Continental Bank Corp., 494
U.S. 472, 481 (1990). Review of entry of summary judgment is de
novo; further, the issues presented are ones of law and our review
is plenary. See National Foreign Trade Council v. Natsios, 181 F.3d
38, 49 (1st Cir. 1999), cert. granted, 68 U.S.L.W. 3178 (U.S. Nov.
29, 1999) (No. 99-474).
 On appeal, Mayagezanos has refined its argument to a
single attack: the federal courts have jurisdiction to consider
this action under NEPA and the United States's failure to regulate
the passage of such nuclear waste through its Exclusive Economic
Zone (EEZ) waters is a "major federal action" within the meaning of
NEPA. Mayagezanos argues that there is a major federal action
because the United States is required to play some role in the
transport of this waste under various international agreements and
customary international law. This complex of interests and
responsibilities, they contend, suffices to establish "major
federal action" under NEPA. The United States rejoins that the
shipment of waste is the "action," it is not being carried out by
a federal agency but by private parties, and the facts do not meet
the tests to determine if there is federal action where the primary
action is carried out by private players.  
 Under NEPA, all U.S. agencies are required to "include in
every recommendation or report on proposals for legislation and
other major Federal actions significantly affecting the quality of
the human environment" a "detailed statement." 42 U.S.C.  4332(2).
This detailed statement, known as an EIS, must address the
environmental impact of proposed actions and alternatives. NEPA
102(2)(C) provides, in pertinent part, that
   all agencies of the Federal Government shall -- . . . (C)
 include in every recommendation or report on proposals
 for legislation and other major Federal actions
 significantly affecting the quality of the human
 environment, a detailed statement by the responsible
 official on (i) the environmental impact of the proposed
 action, (ii) any adverse environmental effects which
 cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action . . . .

42 U.S.C.  4332(2)(C). NEPA's aims are two-fold: to "place[] upon
an agency the obligation to consider every significant aspect of
the environmental impact of a proposed action" and to "ensure[]
that the agency will inform the public that it has indeed
considered environmental concerns in its decisionmaking process."
Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,
Inc., 462 U.S. 87, 97 (1983) (internal quotation marks and
citations omitted); see also Robertson v. Methow Valley Citizens
Council, 490 U.S. 332, 349 (1989).
 Mayagezanos has described the significance of a maritime
accident or incident involving this waste and the government has
responded that all safety precautions have been taken. Arguments
about the safety of such shipments may be made to a variety of
bodies, both in the United States and internationally. Before,
however, U.S. courts may speak to the safety matter, they must
first decide whether they have any authority to address such
issues, a question that turns on whether NEPA applies at all.
 The arguments seem to contain two implicit assumptions:
that NEPA applies to actions outside territorial U.S. lands and
waters and that NEPA's "major federal action" requirement would
work in the same fashion in the domestic and the international
contexts. We are skeptical. See, e.g., United States v. Nippon
Paper Indus. Co., 109 F.3d 1, 12 n.10 (1st Cir. 1997) (Lynch, J.,
concurring). These are difficult problems, but because
Mayagezanos's claims fail even under the "major federal action"
tests used in domestic cases, we need not inquire into the validity
of these assumptions. Consequently, we turn to the domestic case
law.
 This circuit has not recently addressed the criteria to
be used in domestic cases to determine when private activities may
be deemed to be major federal actions under NEPA. In Citizens for
Responsible Area Growth v. Adams, 680 F.2d 835 (1st Cir. 1982),
this court held that construction of an airport hangar by private
parties with private monies was not federal action for NEPA
purposes and that the mere appearance of the proposed construction
on a federally approved Airport Layout Plan did not create
sufficient federal involvement to require an EIS. See id. at 839-
40. The court acknowledged that the need for a federal license or
approval could sometimes trigger NEPA, but not where the approval
did not involve close scrutiny of the action or anything more than
notice for safety purposes. See id. at 840.
 Additional guidance comes from the definition articulated
by the Council on Environmental Quality (CEQ). The regulations of
the CEQ suggest that actions by non-federal actors "with effects
that may be major and which are potentially subject to Federal
control and responsibility" can be major federal actions. 40 C.F.R.
1508.18. Under CEQ regulations, "actions" include "projects and
programs entirely or partly financed, assisted, conducted,
regulated, or approved by federal agencies." 40 C.F.R.
1508.18(a). The "CEQ's interpretation of NEPA is entitled to
substantial deference." Andrus v. Sierra Club, 442 U.S. 347, 358
(1979).
 There are two situations that generally will not
constitute major federal actions under NEPA. The first situation is
governmental inaction, where that failure to act is not otherwise
subject to review by the courts or administrative agencies under
the Administrative Procedure Act or other laws. See 40 C.F.R.
1508.18. The second situation is mere approval by the federal
government of action by a private party where that approval is not
required for the private party to go forward. See New Jersey Dep't
of Envtl. Protection & Energy v. Long Island Power Auth., 30 F.3d
403, 415-16 (3d Cir. 1994); Sierra Club v. Penfold, 857 F.2d 1307,
1314 (9th Cir. 1988); Named Individual Members of San Antonio
Conservation Soc'y v. Texas Highway Dep't, 496 F.2d 1017, 1023-24
(5th Cir. 1974). This latter category encompasses, and disposes of,
the portion of Mayagezanos's argument that is based on the
shippers having voluntarily notified the Coast Guard of the Pacific
Swan's transit through the Mona Passage.
 There are various situations that may constitute major
federal action under NEPA. In cases, such as this one, where there
is no claim that the non-federal project is being federally funded,
the circuits have articulated different formulations of "major
federal action," but the focus has been on the indicia of control
over the private actors by the federal agency. For example, this
circuit found "major federal action" where a federal agency
approved the release of funds from a trust held by the agency that
were necessary for a project to go forward. See Citizens Awareness
Network, Inc. v. United States Nuclear Regulatory Comm'n, 59 F.3d
284, 292-93 (1st Cir. 1995). The effect of this action was
explicitly to permit the private actor to decommission a nuclear
facility. See id. at 292.  
 The Fourth Circuit has held that "a non-federal project
is considered a 'federal action' if it cannot begin or continue
without prior approval by a federal agency and the agency possesses
authority to exercise discretion over the outcome." Sugarloaf
Citizens Ass'n v. Federal Energy Regulatory Comm'n, 959 F.2d 508,
513-14 (4th Cir. 1992) (internal quotation marks and citations
omitted). The Tenth Circuit found that there is a major federal
action when "the federal government has actual power to control the
project." Ross v. Federal Highway Admin., 162 F.3d 1046, 1051 (10th
Cir. 1998) (internal quotation marks and citation omitted). The
Eighth Circuit held in Ringsred v. City of Duluth, 828 F.2d 1305,
1308 (8th Cir. 1987) that "federal action [must be] a legal
condition precedent to the [private event]." The Third Circuit has
said that the federal agency's action must be a legal pre-condition
that authorizes the other party to proceed with action. See NAACP
v. Medical Ctr., Inc., 584 F.2d 619, 628 n.15 (3d Cir. 1978). See
generally Rodgers, Jr., Environmental Law  9.5(C)(1) (2d ed. 1994
& Supp. 1998).
 Like the Fourth Circuit, we look to whether federal
approval is the prerequisite to the action taken by the private
actors and whether the federal agency possesses some form of
authority over the outcome. Mayagezanos make two arguments that
the United States has effectively authorized the shipments. First,
the United States has implicitly consented to such shipments, they
say, under the U.S.-EURATOM Agreement and generally has acted under
the Atomic Energy Act and the Nuclear Non-Proliferation Act.
Secondly, they contend that the United States has the power to stop
such shipments through its EEZ waters, has chosen not to do so, and
so has implicitly authorized the shipments. We evaluate each
argument in turn.

                             III
The Treaties
 Mayagezanos's core argument is that the United States
granted or was required to grant specific authorization for the
shipments of this nuclear waste from France to Japan under the
provisions of the U.S.-EURATOM Agreement.
 Under  123 of the Atomic Energy Act of 1954 (AEA), 42
U.S.C.  2153, certain foreign commerce in nuclear materials must
be governed by "agreement[s] for cooperation" that contain
particular safeguards. See id.  2153(a)(1). This framework was
enhanced with the 1978 enactment of the Nuclear Non-Proliferation
Act (NNPA), 22 U.S.C.  3201 et seq., which intended to ensure
"effective controls by the United States over its exports of
nuclear materials and equipment and of nuclear technology." 22
U.S.C.  3202(d). Acting under this authority, the United States in
1988 entered the U.S.-Japan Agreement. Pursuant to this agreement,
the United States has sold uranium to Japan; the nuclear waste at
issue in this case derived from one of these sales.
 Once the irradiated material leaves Japan for
reprocessing it is governed by another  123 agreement, commonly
called the U.S.-EURATOM Agreement. See Agreement for Cooperation in
the Peaceful Uses of Nuclear Energy Between the United States of
America and the European Atomic Energy Community, H.R. Doc. No.
104-138, at 5 (1995) (entered into force Apr. 12, 1996), available
at 1996 WL 361511. The EURATOM signatories are fifteen European
countries, including France and the United Kingdom. That agreement
includes certain "safeguards," a term of art for systems to verify
that the nuclear material will not be diverted to weaponry or
illicit uses. See International Atomic Energy Agency, The Structure
and Content of Agreements Between the Agency and States Required in
Connection with the Treaty on the Non-Proliferation of Nuclear
Weapons,  28, IAEA Doc. No. INFCIRC/153 (corr.) (1972), available
at www.iaea.org/worldatom/infcircs/inf153.html.
 Article 5.2 of the U.S.-EURATOM Agreement provides that
certain nuclear materials may be removed from the governance of the
Agreement through procedures set out in an Administrative
Arrangement. Once the material in question has been determined,
under agreed-upon procedures, to be "no longer usable for any
nuclear activity relevant from the point of view of international
safeguards or [has] become practically irrecoverable," then the
material is no longer governed by the Agreement. U.S.-EURATOM
Agreement art. 5.2.
 Here, the appropriate authority, which was not the United
States, made the determination that the waste at issue was
"practically irrecoverable," and, as a result, no longer governed
by the Agreement. In addition, the International Atomic Energy
Agency terminated its safeguards because the reprocessed waste was
"practically irrecoverable." As such, the Agreement does not cover
such waste materials and so there is no U.S. federal action
involved.
 Mayagezanos makes three assertions in response. First,
it relies on a provision of the Agreement that provides that
certain material subject thereto may be transferred only on a case-
by-case consent basis. See U.S.-EURATOM Agreement, Agreed Minute,
B.4 ("Retransfers to third countries not included on the lists
may be considered on a case by case basis."). That is no response
as to materials not covered by the Agreement, such as those
involved here.
 The second argument suffers from the same flaw. The
provisions of Article 8.1(C)(ii) or (iii), concerning the transfer
of irradiated nuclear material, simply do not apply to material
removed from the Agreement, such as the nuclear waste at issue
here.
 Mayagezanos's third argument is that article 5.2 of the
Agreement should not be honored because it is inconsistent with
123 of the Atomic Energy Act, the enabling legislation under
which the United States entered the EURATOM Agreement. There are at
least three responses. First, there is no conflict. Article 5.2
serves the purpose of the AEA/NNPA to "ensure that the worldwide
development of peaceful nuclear activities . . . does not
contribute to proliferation." S. Rep. No. 95-467, at 3 (1977),
reprinted in 1978 U.S.C.C.A.N. 326, 328. Second, even if there were
ambiguity, we would be guided by the interpretation of the
Executive Branch that removing materials that are practically
irrecoverable from the operation of the Agreement is consistent
with the AEA/NNPA. See El Al Israel Airlines, Ltd. v. Tsui Yuan
Tseng, 119 S. Ct. 662, 671 (1999) ("Respect is ordinarily due the
reasonable views of the Executive Branch concerning the meaning of
an international treaty."); Sumitomo Shoji Am., Inc. v. Avagliano,
457 U.S. 176, 184-85 (1982); Kolovrat v. Oregon, 366 U.S. 187, 194
(1961); United States v. Lui Kin-Hong, 110 F.3d 103, 110 (1st Cir.
1997) ("[T]he executive branch's construction of a treaty, although
not binding upon the courts, is entitled to great weight.").
Finally, even if Article 5.2 of the Agreement did conflict with the
AEA, this leaves us far from establishing the degree of U.S.
control over these shipments necessary to constitute a "major
federal action." Neither the treaties nor the AEA/NNPA assign the
United States a role, much less control, over this shipment of
nuclear waste, and thus there is no "major federal action" under
NEPA.

The Waters
 Mayagezanos maintains as well that the Pacific Swan's
passage through U.S. EEZ waters in the Mona Passage activates
NEPA's major federal action requirement. The boundaries of the
United States extend, by a 1989 Presidential Proclamation, to
twelve nautical miles offshore, an area called the territorial sea.
See United States v. Ramirez-Ferrer, 82 F.3d 1131, 1133 (1st Cir.
1996) (en banc). Since the distance between Mona Island and the
island of Puerto Rico is about thirty-nine miles, there are at
least fifteen miles of international waters and twenty-four miles
of territorial sea in that part of the Mona Passage that runs
between the two islands. See id. Under customary international law,
the United States has sovereignty and jurisdiction over its
territorial seas, subject to the right of innocent passage. See
United States v. Louisiana, 363 U.S. 1, 34 (1960).
 In addition to the territorial seas, the United States
has an interest in the two-hundred-mile EEZ. See 1 Schoenbaum,
Admiralty and Maritime Law  2-16, at 33-36 (2d ed. 1994). This
case concerns the EEZ, as it is undisputed that the Pacific Swan
did not enter U.S. territorial waters. The interests of a coastal
state in its EEZ largely have to do with development of natural
resources and the availability of scientific research. A coastal
state has limited powers in the EEZ under customary international
law. As set forth in the Restatement (Third) of the Foreign
Relations Law of the United States:
   If the coastal state has clear grounds for believing that
 a foreign ship has violated applicable international
 rules, or the supplementary laws or regulations of the
 coastal state, in the exclusive economic zone, and the
 ship is not in port but is navigating in the exclusive
 economic zone or territorial sea of the coastal state,
 that state may require the ship to give information
 regarding its identity and its port of registry, its last
 and next port of call, and other relevant information
 required to establish whether a violation has occurred.
 If a violation has resulted in a substantial discharge
 causing significant pollution of the marine environment,
 and the ship has refused to give information or the
 information supplied is manifestly at variance with the
 evident factual situation, the coastal state may
 undertake physical inspection of the ship for matters
 relating to the violation. If the discharge causes or
 threatens to cause major damage to the coastline or
 related interests of the coastal state, or to any
 resources of its territorial sea or exclusive economic
 zone, the coastal state may, if the evidence warrants it,
 institute proceedings including detention of the ship in
 accordance with its laws.

Restatement (Third) of the Foreign Relations Law  514, cmt. i.
None of the circumstances described in the Restatement is present
here, so there is no platform from which to begin to construct an
argument that such circumstances could give rise to federal action.
Foreign ships do not require the permission of the United States to
pass through its EEZ.
 Whatever the scope of the United States's potential
powers, either multilaterally or unilaterally, over the EEZ, it is
clear that the United States has not exercised any such powers with
respect to the transport of nuclear waste. Simply stated, the
United States has chosen not to regulate shipments of nuclear waste
through its EEZ -- there is no requirement that it do so, nor is it
immediately evident that it would have that authority if it so
chose. Under these circumstances, there is no major federal
action.

                               IV
 Where this country's multilateral relationships are
involved there is a particularly heavy burden on Mayagezanos to
demonstrate a "major federal action" for NEPA purposes, and thus to
involve the courts. It has not come close. That is not to say that
Mayagezanos's concerns about the safety of the shipments are
frivolous, a matter that we do not judge, only that such concerns
should be presented elsewhere.
 The grant of summary judgment for defendants is affirmed.
No costs are awarded.

</body>

</html>