CITIZENS FOR RESPONSIBLE AREA GROWTH, et al., Plaintiffs, Appellees,

v.

Brock ADAMS, Secretary of Transportation, et al., Defendants, Appellees.

AMCA International Corporation, Appellant.

Nos. 81–1602, 81–1760.

United States Court of Appeals, First Circuit.

Argued March 2, 1982.

Decided May 25, 1982.

John J. Curtin, Jr., Boston, Mass., with whom Alexandra Leake, William G. Southard, Bingham, Dana & Gould, Boston, Mass., Nicholas D. N. Harvey, Stebbins & Bradley, P. A., and Jack G. Duncan, Hanover, N. H., were on brief, for appellant.

Peter R. Teachout, South Royalton, N. H., for plaintiffs, appellees Citizens for Responsible Area Growth, et al.

Robert F. Eisengrein, Federal Aviation Administration, Washington, D. C., with whom W. Stephen Thayer, III, U. S. Atty., Concord, N. H., was on brief, for defendant, appellee United States of America.

Before COFFIN, Chief Judge, ALDRICH and BREYER, Circuit Judges.

---

BREYER, Circuit Judge.

This case arises out of appellant AMCA's efforts to build a new hangar for four corporate jet planes at the Lebanon, New Hampshire, airport. The complicated procedural and substantive legal issues it raises can be resolved by focusing upon one fairly simple question: Did the district court abuse its discretion in interpreting a consent decree to prohibit AMCA from building the hangar? We conclude that it did, and that the decree must therefore be modified to allow construction—a holding that moots all other issues in the case.

I

The case was originally brought by an environmental group, Citizens for Responsible Area Growth (CRAG), in February 1979. CRAG sued several federal departments, the City of Lebanon and the Lebanon Regional Airport Authority, claiming that current and proposed development at the airport violated § 102(2)(c) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(c), and several other laws. On August 23, 1979, the district court entered a preliminary injunction. *CRAG v. Adams*, 477 F.Supp. 994 (D.N.H.1979). The court described the "development" as including 1) "construction of the airport parking lot access roads, taxiways and underground utilities"—all of which had been completed; 2) "construction of the terminal building and related utilities"—which was underway; and 3) "extension of the access road," a "runway extension," and an extension of "underground utilities to the contemplated industrial park"—which were in the design or bidding stage. *Id.* at 997. The court further referred to the development project as comprising construction of an airport terminal building and the development of an industrial park, utilities, water and sewer lines to the proposed park, runway extension, taxiway system, runway lighting, taxiway lighting, and instrument landing system. *Id.* at 997 n. 2. This description fairly summarizes CRAG's characterization of the project in its complaint. It also tracks CRAG's description in a subse-

quent pleading, which said the project included "three major development components: a proposed runway extension . . . an expanded new terminal building . . . and development of a proposed new industrial airpark . . . [all of which] would be served by a common road-utilities infrastructure."

The court concluded that federal involvement in this project was likely to prove significant enough to require an Environmental Impact Statement (EIS). 42 U.S.C. § 4332(2)(c). This statement had not been prepared. Hence, the court preliminarily enjoined the defendants

from taking any action:

1. To effectuate federal participation . . . in . . .

a. Any extension of Runway 18–36 . . . [or]

b. Any extension from the terminal building . . . of a gravel or paved access road or water or sewage utilities to the site of a future proposed industrial park
. . . .

The injunction also forbade the City of Lebanon

2. . . . [from] construct[ing] . . . or . . . commit[ting itself] to undertaking, supervising or funding such extension of the runway, road, or utilities . . . as described in . . . paragraph 1, above.

On January 29, 1981, the City of Lebanon sold AMCA an option to lease 4.5 acres of land at the airport to build a new hangar. AMCA currently owned a hangar (on other airport land) with room for two jets inside and two outside on the apron. The new hangar would house four jets.

In March 1981, the City of Lebanon asked the district court to rule that its preliminary injunction did not cover the new hangar. It stated that neither the runway extension nor the industrial park road, nor federal funding was involved. CRAG opposed, arguing that there was significant federal involvement. Though CRAG did not claim any federal funds were involved, it stressed that 1) the hangar (like the "airpark") would include office space; 2) the hangar would use the federally funded "infrastructure" (utilities, roads, water lines,

and so on); 3) building the hangar would require extending the "infrastructure;" and 4) the new hangar proposal had been included in a long-range "Airport Layout Plan" submitted to the Federal Aviation Administration in 1978. On March 26, 1981, the court held a status conference, heard argument and ordered the parties to explore settlement.

On May 6, 1981, AMCA filed a motion to intervene under Fed.R.Civ.P. 24, which states:

Upon timely application anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

AMCA pointed out that its hangar and its lease option had become issues in the pending lawsuit; that the disposition of Lebanon's motion affected it more than anyone else; and that it had by far the strongest motive to defend its right to build. In a supporting memo and affidavit, AMCA stated that it will pay all costs of constructing the hangar; that the hangar is outside the proposed "industrial airpark;" that the hangar will not require an extension of the runways, roads, utilities, or structures subject to the injunction; and that the utilities and access roads needed to serve "the hangar will connect to existing, completed utilities which service the terminal building and to the existing terminal access road." On May 14, the federal defendants wrote to the court that settlement negotiations had not proved successful. And, on May 18, they submitted to the court a proposed offer of judgment that had nothing to do with the hangar, but that would have had the FAA prepare an EIS related to the runway extension and the industrial park.

On June 25, 1981, the district court held a hearing and again urged the parties to negotiate a settlement. Later that day, the parties reached agreement on the federal defendants' May 18 draft with several modifications. Two of those modifications are at issue here. The first of these states that the FAA will review the "hangar development . . . to determine whether it is related to the 1300 foot runway extension or the 50 acre industrial park only for purposes of determining the need to cumulatively assess. Any party dissatisfied with FAA's conclusion may, forthwith, apply to the Court for review of such determination." *CRAG v. Adams*, No. 79–61 at ¶ 7(g)(G) (D.Mass. July 1, 1981). The second of these states "[i]t is agreed that the injunction covers all other presently contemplated developments at Lebanon Airport, including hangar development. . . ." *Id.* at ¶ 10 ("Paragraph 10").

When the parties returned to court that day, they discussed these and other modifications before the judge. On the point here at issue the following exchange occurred between AMCA's counsel, Mr. Curtin, and Lebanon's counsel, Mr. Brown:

MR. CURTIN: Your Honor, as I read [the decree], I don't understand [the circumstances under which] . . . we are free to go forward and build our hangar, because it seems internally inconsistent based on my quick reading of this, in which I did not participate. I can't imagine that if the FAA decides rapidly that our hangar does not impact, [and] is not related to the 1300-foot runway extension [or] the 50-acre industrial park, that there is any reason for us to be prevented from building our hangar.

THE COURT: Well, I suggest you talk to Mr. Brown about that.

MR. BROWN: Weren't we going to at that point, when they make their determination, if any other party objects to the determination a motion forthwith was to come to the Court and the Court would then determine the matter? Now, I think the answer to your question, sir, is that if the Court determines that it's unrelated and needs no assessment, at that point you don't have to be a party, Mr. Curtin. At that point I want your rent. I will ask the Court to permit us to

permit you to build your lovely hangar, and the sooner that's done the better for both of us, but that procedure was what we worked out in order to expedite it, if we can.

AMCA still objected to the proposed settlement. It argued that the parties, to some extent, had bargained away its rights. The court, however, denied AMCA's May 6 motion to intervene (on the ground that it was not timely) and then accepted the settlement. (AMCA appeals the denial of its motion to intervene.)

On July 1, the FAA wrote to the parties stating that it had "completed a review of the interrelationship between the proposals for the AMCA hangar and the ... extension of Runway 18–36 and the 50 acre industrial park ... pursuant to Judge Zobel's Order of June 25, 1981 . . . ." It "determined that there is no interrelationship between the AMCA Hangar project" and the other proposals. It referred several times to "the proposal to relocate the the AMCA hangar," set forth an analysis, and repeated its conclusion and consequent decision not to include "the AMCA hangar development" in the EIS.

Subsequently, on July 8, AMCA again moved to intervene in the proceedings and (under Fed.R.Civ.P. 60(b)) to modify paragraph 10 of the decree in light of the FAA's determination that the hangar had nothing to do with the runway or industrial park development. On July 16, the Lebanon defendants also moved to modify the decree to allow the hangar to be built, noting that no one had asked the court "forthwith" to review the FAA's conclusion. The next day, July 17, CRAG asked for review of the FAA's determination and, four days later on July 21, opposed modification of the decree.

On August 14, 1981, the district court held a hearing on these, and related, motions by telephone. The transcript reveals the following: CRAG opposed AMCA's intervention, but the judge allowed AMCA to intervene. CRAG argued that, AMCA's hangar proposal aside, the FAA should still study hangar development in the EIS, in part because other hangar developments were being considered. Referring to the June 25th settlement decree, Lebanon's counsel then stated the issue as follows:

MR. BROWN: There was [a] colloquy between Mr. Curtin and yourself and myself, which I think makes it abundantly clear that what everybody understood then, regardless of what their positions may be now, was that the additional language with regard to the FAA making an early determination, was that if FAA concluded that the hangar development, and they were talking about AMCA, was not related to either the runway extension or the 50-acre park that was to be subjected to the EIS process that was in field, that upon that conclusion being made, if your Honor on a timely, and that wasn't timely, on a forthwith objection agreed with FAA on that limited issue that the AMCA's hangar itself would then be free to go ahead.

Mr. Curtin asked, your Honor, if that was what was intended. Your Honor suggested that he make the inquiry of me. And I replied. And I stated then that my understanding was that if the FAA determination was that there was no environmental relation, the Court would on motion make that either the rule or not, depending upon how your Honor views it, and that then we would want our rent, and that we would ask the Court to permit us, Lebanon, to permit AMCA to build, I said the lovely hangar, and the sooner the better. And I commented that we had worked out this early report procedure to expedite that release of ... AMCA's hangar from the potential hangar developments planned.

So far as I am aware, nobody is suggesting that they be exempted, but neither is it suggested—

THE COURT: They can be what?

MR. BROWN: Nobody is suggesting that anything except AMCA be exempted from the order. Nor will the City of Lebanon be permitting any hangar development other than AMCA to go forward during the period we anticipated as the period for the complet[ion] of the EIS.

The awkward thing about this entire thing, if it please the Court, is that the Court has, I think, no authority to impede the development of privately financed structures at that airport. There is no federal money even asked for on this.

The court said it interpreted the FAA letter very narrowly. The court understood the letter to "deal only with the relocation of the AMCA hangar," not with any expansion of AMCA's total hangar space. It said it would "affirm the FAA's determination" to that extent.

The court then indicated that it did not believe the FAA's determination would influence its consideration of the motion to modify the preliminary injunction. It offered the following interpretation of the injunction: "If the AMCA hangar is indeed simply a relocation of an existing facility, I do not deem it to be within the injunction. If, on the other hand, it is an expansion of a facility, then it seems to me it is barred by the existing injunction."

AMCA's counsel stated that AMCA proposed to build a four-jet hangar to replace a two-jet hangar; that no one had ever doubted this; and, this precise proposal was what the FAA had considered and what all parties, but CRAG, were asking her to allow. Although CRAG's counsel was not heard on this point, the court reasserted its narrow view of the FAA letter and refused to modify the injunction. An appropriate order was entered on September 16, and AMCA appeals.

## II

AMCA's two appeals complain of the district court's denial of its May 6 motion to intervene on June 25, 1981, and the denial of its and Lebanon's motions to modify the decree to allow AMCA to build its hangar. By the first of these appeals, AMCA apparently intends to obtain sufficient standing in the case as of June 25 to allow it to set aside the June 25 settlement and thereby to obtain the right to build its hangar. Because our decision on the second appeal gives AMCA the substantive relief it seeks, we need not consider the first appeal.

We uphold AMCA's position on the second appeal, and conclude that the district court abused its discretion in refusing to modify paragraph 10 of the June 25 decree. In our view, two important factors argue in favor of modification and little argues against it.

First, the record suggests that AMCA's hangar construction was not sufficiently federal to be directly enjoinable under NEPA. This factor is important both because it defines the issue that the parties were discussing in ¶ 7(g)(G) and because the trial court appears to have been misled by counsel to believe that any "expansion" at the airport was enjoinable, regardless of whether there was federal involvement in that expansion.

 The law in this circuit and elsewhere is clear. NEPA applies only to "federal" actions. And, a project such as this one, which is not itself federally funded nor significantly bound up in a federally funded project, is not "federal." *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 327–29 (9th Cir. 1975); *City of Boston v. Volpe*, 464 F.2d 254, 257–58 (1st Cir. 1972). *See State of Alaska v. Andrus*, 591 F.2d 537, 540–42 (9th Cir. 1979); *Save the Bay, Inc. v. United States Corps of Engineers*, 610 F.2d 322, 326–27 (5th Cir. 1980). In this case, it is undisputed that the AMCA project will be paid for entirely out of private funds. It arose after the activities that CRAG initially listed in its complaint. And, in our view, CRAG's assertions of "federal involvement," even if true, are inadequate to support a preliminary injunction.

CRAG asserts, for example, that the hangar will use federally funded utilities, roads and sewer lines, will require their extension, and is subject to a federal-state "utility use" agreement. Yet CRAG offers no response to AMCA's map and affidavits indicating that the hangar is to be located near the terminal on an existing road, and will use existing utilities. In any event, AMCA has indicated that it will pay for any necessary connections to existing power lines, sewers and roads. CRAG provides us

with no sound reason to believe the connections it asserts are any more intimate than those between any building anywhere and the power, sewers, water or roads (which may well be paid for partly out of federal funds) that serve it.

CRAG also states that the hangar appears on an "Airport Layout Plan" submitted to the FAA for approval in 1978. Although the need for a federal license or approval can sometimes trigger NEPA, *see State of Alaska v. Andrus,* 591 F.2d at 540–41, it has been held that the mere appearance of proposed construction on an "Airport Layout Plan" does not create sufficient federal involvement to require an EIS. *Friends of the Earth, Inc. v. Coleman,* 518 F.2d at 328; *City of Boston v. Volpe,* 464 F.2d at 256, 258–60; *City of Boston v. Brinegar,* 6 E.R.C. 1961 (D.Mass.1974). The plan's approval does not necessarily carry with it close scrutiny of all its individual constituent parts; it does not mean that any or all of the structures indicated on it will ever be built; and it carries with it no federal money. Subsequent notice to the FAA if the hangar is built does not involve an agency "go-ahead," but takes place to allow the FAA to tell pilots and others of the structure's existence for reasons of safety. It does not significantly increase federal involvement.

CRAG further asserts that Lebanon's expenses in litigating the hangar issue are part of a general agreement with the FAA to reimburse Lebanon for legal costs related to the airport project. This fact, however, is of trivial significance.

CRAG finally asserts, and this seems to be its main point, that reduced use of corporate jets is one EIS alternative to the federally funded airport expansion. And, CRAG points out, reduced corporate jet use would obviate the need for a hangar. The fact that prohibiting an activity is an *alternative* to a federally funded project, however, does not mean that the activity becomes "federal" itself. Fewer office buildings, for example, might mean less energy demand, and thus might diminish the need for federally sited oil refineries. But, this does not

mean that those who construct office buildings must file an EIS. The issue is federal involvement in the project itself.

Having examined the relevant case law, including the "San Antonio" case to which CRAG referred at oral argument, *San Antonio Conservation Society v. Texas Highway Department,* 446 F.2d 1013, 1024–25 (5th Cir. 1971), we can find no support for CRAG's claim. *See San Antonio Conservation Society v. Texas Highway Department,* 496 F.2d 1017, 1024 (5th Cir. 1974). To put the matter conservatively, we have serious doubts about whether CRAG has asserted sufficient facts to require an EIS covering the AMCA hangar, and we are certain that the record could not support the issuance of a preliminary injunction (either against AMCA's building the hangar or against Lebanon's allowing AMCA to do so) on NEPA grounds. Nor does the record reveal any other ground for such an injunction. In any event, the hearing of June 25 and the consent decree make clear that—whatever CRAG's initial claims—the case had boiled down to CRAG's demand that an EIS be prepared before Lebanon went ahead with the runway extension and the industrial park development. CRAG's objections to the hangar rested upon its claim that the hangar was related to either the runway or the park. Thus, in the context of this suit at that time, once it was determined that the hangar was not significantly related to either of these other projects, CRAG was without legal basis for an injunction against it.

Second, the statements at the June 25 hearing make clear that CRAG did not obtain, as a condition of settlement, an injunction against the hangar, lasting as long as the injunction against the runway and the industrial park development, *no matter what* the FAA and court determined to be the relationship among them. The absence of CRAG's legal right to such an injunction suggests the parties did not mean to agree to include it in the settlement. And, lest there be any doubt on the matter, Lebanon specifically asserted to the judge—in the presence of CRAG and all other parties—

that it was *not* the intent of the parties to continue the AMCA injunction if the FAA found no involvement (as long as the court believed the finding was reasonable.) *See* pp. 5–8 *supra.* CRAG sat silent through the discussion of this point among the judge, Lebanon and AMCA. Had CRAG objected to this interpretation, AMCA would presumably have objected to the decree even more vigorously than it did, the decree would have appeared far less reasonable, and the judge might have decided differently about allowing AMCA to protect its rights (by, for example, allowing AMCA to become a party at that time). Under these circumstances, fairness requires that little weight be given to CRAG's current contrary interpretation of the decree.

Thus, the following factors favored modification of decree paragraph 10 when modification was sought: CRAG's likely lack of any legal right to enjoin the hangar, the narrowing of the issues to NEPA-related questions, the FAA's determination (which effectively removed any NEPA-related legal basis for an injunction), and the June 25 explanation of the decree (indicating that it was to be modified in the present circumstances). On the other side, weighing against these considerations, we find virtually nothing. The district court's discussion of the difference between "relocation" and "expansion" of the hangar, whatever its bearing upon the likely magnitude of the new hangar's effects, has no bearing on the legally relevant threshold issue of federal involvement. The FAA's determination of noninvolvement was based on a correct understanding of AMCA's proposed project. The district court itself affirmed that finding for EIS purposes. Nothing in the record provides any basis for refusing to accord the FAA finding determinative effect under ¶ 7(g)(G).

For these reasons, we have concluded that the court erred in refusing to modify the injunction contained in the June 25 order. We therefore vacate the court's order of September 16 and remand for proceedings consistent with this opinion.

*Vacated and remanded.*