**MAYAGUEZANOS POR LA SALUD Y EL AMBIENTE, et al., Plaintiffs, Appellants,**

v.

**UNITED STATES of America, et al., Defendants, Appellees.**

No. 99–1412.

United States Court of Appeals, First Circuit.

Heard Nov. 3, 1999.

Decided Dec. 20, 1999.

Juan A. Giusti–Cordero, with whom Pedro J. Varela–Fernandez was on brief, for appellants.

Sean H. Donahue, Attorney, Environmental and Natural Resources Division, U.S. Department of Justice, with whom Janet Masters, Trial Attorney, Office of General Counsel, U.S. Department of Energy; Horst Greczmiel, Office of Environmental Law, United States Coast Guard; James F. Simon, Acting Assistant Attorney General, Environmental and Natural Resources Division, U.S. Department of Justice; Guillermo Gil, United States Attorney, Isabel Munoz Acosta, Assistant United States Attorney; Ellen Durkee, John T. Stahr, and Stephen G. Bartell, Attorneys, U.S. Department of Justice, were on brief, for appellees.

Before LYNCH, Circuit Judge, CAMPBELL, Senior Circuit Judge, and O'TOOLE, District Judge.*

LYNCH, Circuit Judge.

On February 3, 1998, the Pacific Swan, a British-flag freighter carrying a cargo of vitrified high-level nuclear waste, passed through the Mona Passage, a stretch of seas between the islands of Puerto Rico and Hispaniola. It was bound for Japan, by way·of the Panama Canal, from France. A day earlier, a group of fishermen and environmental organizations from western Puerto Rico, fearing an accident or maritime disaster, brought this action for an injunction to stop the shipment until the United States filed an Environmental Impact Statement (EIS) in accordance with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* After the parties filed cross-motions for summary judgment, the district court denied the claim for injunctive relief and dismissed the action. *See Mayagüezanos por la Salud y el Ambiente v. United States,* 38 F.Supp.2d 168, 178 (D.P.R.1999). We affirm on different reasoning.

## I

The voyage of the Pacific Swan is part of a modern circumferential trade. Uranium from the United States is sent to Japan to fuel nuclear energy reactors. Ja-

* Of the District of Massachusetts, sitting by designation.

pan ships the reactors' spent fuel to COGEMA, a French nuclear power company, for recycling at its La Hague plant. This process recovers a substantial portion of reusable fissionable material, which is turned into nuclear fuel (either RepU fuel, comprising uranium, or MOX fuel, comprising plutonium and uranium). It also generates high-level nuclear waste, which includes trace amounts of uranium and plutonium. The waste is vitrified[1] according to specifications that have been approved by French and Japanese governments and placed in casks that meet criteria set forth by the International Atomic Energy Agency in its Regulations for the Safe Transport of Radioactive Material. Both the waste and the fuel are returned to Japan on board specially designed ships that meet the standards of the International Maritime Organization's Code for the Safe Carriage of Irradiated Nuclear Fuel, Plutonium and High–Level Radioactive Wastes in Flasks on Board Ships, IMO Resolution A 18/Res. 748, Annex (1993).[2] The private shippers[3] choose the return route to Japan from three options: the Cape of Good Hope, Cape Horn, or the Panama Canal.

The U.S. connection to this trade occurs in two ways. First, the United States supplies the uranium to Japan under a 1988 agreement between the two countries. *See Agreement for Cooperation Between the Government of the United States and the Government of Japan Concerning Peaceful Uses of Nuclear Energy*, Nov. 4, 1987, H.R. Doc. No. 100–128 (1987) (entered into force July 17, 1988), *available at* 1988 WL 582501 at *3 ("*U.S.-Japan Agreement*"). Second, the transport of the nuclear waste shipments through the Mona Passage means that the ship traverses waters in which the United States has some interest, even if they are not territorial waters.

## II

Because these waste-laden voyages through the Mona Passage continue, the case is not moot, which the United States appropriately concedes. *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 481, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). Review of entry of summary judgment is de novo; further, the issues presented are ones of law and our review is plenary. *See National Foreign Trade Council v. Natsios*, 181 F.3d 38, 49 (1st Cir.1999), *cert. granted*, 68 U.S.L.W. 3178 (U.S. Nov. 29, 1999) (No. 99–474).

On appeal, Mayagüezanos[4] has refined its argument to a single attack: the federal courts have jurisdiction to consider this action under NEPA and the United States's[5] failure to regulate the passage of such nuclear waste through its Exclusive Economic Zone (EEZ) waters is a "major federal action" within the meaning of

1. The verification process turns the waste into a solid glass form, thereby "immobilizing" it. According to Frederick F. McGoldrick, the State Department's Principal Deputy Director of Nuclear Energy Affairs, the vitrified waste is "very insoluble in water, resistant to heat, and extremely stable."

2. This case is concerned with the passage of nuclear waste, not nuclear fuel. Though shipments of spent nuclear fuel, plutonium, and lower-level waste have passed through the Canal before, this, apparently, was the first such shipment of high-level nuclear waste.

3. Japanese electric utilities have contracted for the reprocessing of spent fuel with COGEMA and British Nuclear Fuels Ltd. (BNFL). The Pacific Swan was operated by Pacific Nuclear Transport Ltd., a company jointly run by BNFL, COGEMA, and ten Japanese utilities.

4. In addition to Mayagüezanos, the named plaintiffs are Liga Ecológica Puertorriqueña del Noroeste, Inc., Tourism Association of Rincón, Inc., Asociación de Pescadores del El Maní, and Asociación de Pescadores de El Seco. The United States has not challenged the plaintiffs' standing.

5. In addition to the United States, the named defendants are the Departments and Secretaries of State and Energy, the U.S. Coast Guard, BNFL, COGEMA, Pacific Nuclear Transport Ltd., Malcolm L. Miller, Gavin Carter, and Christophe Xerri.

NEPA.[6] Mayagüezanos argues that there is a major federal action because the United States is required to play some role in the transport of this waste under various international agreements and customary international law. This complex of interests and responsibilities, they contend, suffices to establish "major federal action" under NEPA. The United States rejoins that the shipment of waste is the "action," it is not being carried out by a federal agency but by private parties, and the facts do not meet the tests to determine if there is federal action where the primary action is carried out by private players.

■ Under NEPA, all U.S. agencies are required to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" a "detailed statement." 42 U.S.C. § 4332(2). This detailed statement, known as an EIS, must address the environmental impact of proposed actions and alternatives. NEPA § 102(2)(C) provides, in pertinent part, that

> all agencies of the Federal Government shall—... (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided

should the proposal be implemented, (iii) alternatives to the proposed action....

42 U.S.C. § 4332(2)(C). NEPA's aims are two-fold: to "place[ ] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and to "ensure[ ] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (internal quotation marks and citations omitted); *see also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

Mayagüezanos has described the significance of a maritime accident or incident involving this waste and the government has responded that all safety precautions have been taken.[7] Arguments about the safety of such shipments may be made to a variety of bodies, both in the United States and internationally. Before, however, U.S. courts may speak to the safety matter, they must first decide whether they have any authority to address such issues, a question that turns on whether NEPA applies at all.

The arguments seem to contain two implicit assumptions: that NEPA applies to actions outside territorial U.S. lands and

**6.** In its brief, Mayagüezanos also contended that the shipments of vitrified high-level nuclear waste from France to Japan violate the U.S.-EURATOM Agreement and the Atomic Energy Act, as amended by the Nuclear Non-Proliferation Act. Mayagüezanos abandoned that theory at oral argument.

**7.** Mayagüezanos asserts that "[t]he serial transportation of [this waste] through the Mona Passage is likely to cause loss of marine habitat, degradation of water quality, and irreparable damages to the ecosystem of the West Coast of Puerto Rico, as well as to threaten rare plant and animal species in Mona Island and to impair long-term scientific research projects in the area." The United States says that it is "keenly interested in

ensuring that the transportation of [vitrified high-level nuclear waste] be carried out safely in accordance with applicable international standards ..., particularly when the transportation route approaches United States territory," and that it has "every reason to believe that this and future shipments will be completed in a safe and secure manner, and that the shipments do not pose any significant risk to 'health, safety, or the environment.'" It points to the conclusion of Charles D. Massey of Sandia National Laboratories that "the risk that there would be any significant environmental impact from marine transport of vitrified high level waste is less than one chance in a billion."

waters[8] and that NEPA's "major federal action" requirement would work in the same fashion in the domestic and the international contexts.[9] We are skeptical. *See, e.g., United States v. Nippon Paper Indus. Co.,* 109 F.3d 1, 12 n. 10 (1st Cir.1997) (Lynch, J., concurring). These are difficult problems, but because Mayagüezanos's claims fail even under the "major federal action" tests used in domestic cases, we need not inquire into the validity of these assumptions. Consequently, we turn to the domestic case law.

This circuit has not recently addressed the criteria to be used in domestic cases to determine when private activities may be deemed to be major federal actions under NEPA. In *Citizens for Responsible Area Growth v. Adams,* 680 F.2d 835 (1st Cir. 1982), this court held that construction of an airport hangar by private parties with private monies was not federal action for NEPA purposes and that the mere appearance of the proposed construction on a federally approved Airport Layout Plan did not create sufficient federal involvement to require an EIS. *See id.* at 839–40. The court acknowledged that the need for a federal license or approval could sometimes trigger NEPA, but not where the approval did not involve close scrutiny of

the action or anything more than notice for safety purposes. *See id.* at 840.

■ Additional guidance comes from the definition articulated by the Council on Environmental Quality (CEQ). The regulations of the CEQ suggest that actions by non-federal actors "with effects that may be major and which are potentially subject to Federal control and responsibility" can be major federal actions. 40 C.F.R. § 1508.18. Under CEQ regulations, "actions" include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a). The "CEQ's interpretation of NEPA is entitled to substantial deference." *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979).

■ There are two situations that generally will not constitute major federal actions under NEPA. The first situation is governmental inaction, where that failure to act is not otherwise subject to review by the courts or administrative agencies under the Administrative Procedure Act or other laws. *See* 40 C.F.R. § 1508.18. The second situation is mere approval by the federal government of action by a private

**8.** The Supreme Court, in *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991), reaffirmed the presumption against extraterritorial application of statutes. *But see id.* at 261–66, 111 S.Ct. 1227 (Marshall, J., dissenting). Few courts, however, have decided whether NEPA applies extraterritorially. *Compare Environmental Defense Fund, Inc. v. Massey,* 986 F.2d 528, 533 (D.C.Cir.1993) ("[S]ince NEPA is designed to regulate conduct occurring within the territory of the United States, and imposes no substantive requirements which could be interpreted to govern conduct abroad, the presumption against extraterritoriality does not apply to this case."), *with Natural Resources Defense Council, Inc. v. Nuclear Regulatory Comm'n,* 647 F.2d 1345, 1366 (D.C.Cir.1981) (Wilkey, J.) ("I find only that NEPA does not apply to [Nuclear Regulatory Commission] nuclear export licensing decisions—and not necessarily that the EIS requirement is inapplicable to some other kind of major federal action abroad."), *and NEPA*

*Coalition of Japan v. Aspin,* 837 F.Supp. 466, 467 (D.D.C.1993) (finding that NEPA did not apply to U.S. actions at military installations in Japan in light of treaty obligations). *See also* Exec. Order No. 12114, 44 Fed.Reg. 1957 (1979) ("[M]ajor Federal actions significantly affecting the environment of the global commons" require an EIS.). *See generally* Mandelker, *NEPA Law and Litigation* § 5.04 (2d ed.1999); Dodge, *Understanding the Presumption Against Extraterritoriality,* 16 Berkeley J. Int'l L. 85, 101–19 (1998); Gonzalez-Perez & Klein, *The International Reach of the Environmental Impact Statement Requirement of the National Environmental Policy Act,* 62 Geo. Wash. L.Rev. 757, 774–94 (1994).

**9.** Since the power over foreign relations is given to Congress and the President, intervention by the courts should require a clear expression of intention from the other branches that such intervention is warranted. *See United States v. Lui Kin–Hong,* 110 F.3d 103, 106 (1st Cir.1997).

party where that approval is not required for the private party to go forward. *See New Jersey Dep't of Envtl. Protection & Energy v. Long Island Power Auth.*, 30 F.3d 403, 415–16 (3d Cir.1994); *Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (9th Cir.1988); *Named Individual Members of San Antonio Conservation Soc'y v. Texas Highway Dep't*, 496 F.2d 1017, 1023–24 (5th Cir.1974). This latter category encompasses, and disposes of, the portion of Mayagüezanos's argument that is based on the shippers having voluntarily notified the Coast Guard of the Pacific Swan's transit through the Mona Passage.

There are various situations that may constitute major federal action under NEPA. In cases, such as this one, where there is no claim that the non-federal project is being federally funded, the circuits have articulated different formulations of "major federal action," but the focus has been on the indicia of control over the private actors by the federal agency. For example, this circuit found "major federal action" where a federal agency approved the release of funds from a trust held by the agency that were necessary for a project to go forward. *See Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 292–93 (1st Cir.1995). The effect of this action was explicitly to permit the private actor to decommission a nuclear facility. *See id.* at 292.

The Fourth Circuit has held that "a non-federal project is considered a 'federal action' if it cannot begin or continue without prior approval by a federal agency and the agency possesses authority to exercise discretion over the outcome." *Sugarloaf Cit-*

izens *Ass'n v. Federal Energy Regulatory Comm'n*, 959 F.2d 508, 513–14 (4th Cir. 1992) (internal quotation marks and citations omitted). The Tenth Circuit found that there is a major federal action when "the federal government has actual power to control the project." *Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir.1998) (internal quotation marks and citation omitted). The Eighth Circuit held in *Ringsred v. City of Duluth*, 828 F.2d 1305, 1308 (8th Cir.1987) that "federal action [must be] a legal condition precedent to the [private event]." The Third Circuit has said that the federal agency's action must be a legal pre-condition that authorizes the other party to proceed with action. *See NAACP v. Medical Ctr., Inc.*, 584 F.2d 619, 628 n. 15 (3d Cir.1978). *See generally* Rodgers, Jr., *Environmental Law* § 9.5(C)(1) (2d ed. 1994 & Supp. 1998).

■ Like the Fourth Circuit, we look to whether federal approval is the prerequisite to the action taken by the private actors and whether the federal agency possesses some form of authority over the outcome.[10] Mayagüezanos make two arguments that the United States has effectively authorized the shipments. First, the United States has implicitly consented to such shipments, they say, under the U.S.-EURATOM Agreement and generally has acted under the Atomic Energy Act and the Nuclear Non–Proliferation Act. Secondly, they contend that the United States has the power to stop such shipments through its EEZ waters, has chosen not to do so, and so has implicitly authorized the

---

10. The district court reasoned that because the United States had no power or discretion to regulate shipments of nuclear waste due to the right of innocent passage, it followed that there was no major federal action. A possible, but not necessary, inference from this reasoning is that if the United States had discretion to act, that would suffice to constitute a major federal action. We reject any such reasoning and doubt that this was what the district court intended.

We also note that the CEQ definition of major federal action refers to activities that are "potentially subject to Federal control" and that a similar, but also not necessary, inference could be drawn from this. We also reject this inference. We understand the phrase to refer to situations in which the government inaction is subject to review under the APA or other laws, as set forth in 40 C.F.R. § 1508.18.

shipments. We evaluate each argument in turn.

## III

*The Treaties*

■ Mayagüezanos's core argument is that the United States granted or was required to grant specific authorization for the shipments of this nuclear waste from France to Japan under the provisions of the U.S.-EURATOM Agreement.

Under § 123 of the Atomic Energy Act of 1954(AEA), 42 U.S.C. § 2153, certain foreign commerce in nuclear materials must be governed by "agreement[s] for cooperation" that contain particular safeguards. *See id.* § 2153(a)(1). This framework was enhanced with the 1978 enactment of the Nuclear Non-Proliferation Act (NNPA), 22 U.S.C. § 3201 *et seq.*, which intended to ensure "effective controls by the United States over its exports of nuclear materials and equipment and of nuclear technology." 22 U.S.C. § 3202(d). Acting under this authority, the United States in 1988 entered the U.S.-Japan Agreement. Pursuant to this agreement, the United States has sold uranium to Japan; the nuclear waste at issue in this case derived from one of these sales.

Once the irradiated material leaves Japan for reprocessing it is governed by another § 123 agreement, commonly called the U.S.-EURATOM Agreement. *See Agreement for Cooperation in the Peaceful Uses of Nuclear Energy Between the United States of America and the European Atomic Energy Community*, H.R. Doc. No. 104–138, at 5 (1995) (entered into force Apr. 12, 1996), *available at* 1996 WL

361511. The EURATOM signatories are fifteen European countries, including France and the United Kingdom. That agreement includes certain "safeguards," a term of art for systems to verify that the nuclear material will not be diverted to weaponry or illicit uses. *See* International Atomic Energy Agency, *The Structure and Content of Agreements Between the Agency and States Required in Connection with the Treaty on the Non–Proliferation of Nuclear Weapons*, ¶ 28, IAEA Doc. No. INFCIRC/153 (corr.) (1972), *available at* www.iaea.org/worldatom/infcircs/inf153.html.

Article 5.2 of the U.S.-EURATOM Agreement provides that certain nuclear materials may be removed from the governance of the Agreement through procedures set out in an Administrative Arrangement. Once the material in question has been determined, under agreed-upon procedures, to be "no longer usable for any nuclear activity relevant from the point of view of international safeguards or [has] become practically irrecoverable," then the material is no longer governed by the Agreement. U.S.-EURATOM Agreement art. 5.2.

Here, the appropriate authority, which was not the United States, made the determination that the waste at issue was "practically irrecoverable," and, as a result, no longer governed by the Agreement.[11] In addition, the International Atomic Energy Agency terminated its safeguards because the reprocessed waste was "practically irrecoverable." As such, the Agreement does not cover such waste materials and so there is no U.S. federal action involved.[12]

---

11. According to Frederick F. McGoldrick, the Principal Deputy Director of the State Department's Office of Nuclear Energy Affairs, paragraph 4.3 of the Administrative Arrangement provides that determinations under article 5.2 "shall be made by the appropriate authority of the party holding the item subject to the Agreement before the removal[.]" The appropriate authority here was the EURATOM Safeguards Directorate, which made the determination that the waste at issue was prac-

tically irrecoverable and not subject to the Agreement.

12. The materials are not unregulated, however. The ship's flag nation has responsibility to take measures necessary to control pollution of the marine environment and to ensure the safety of the ships at sea. *See* Restatement (Third) of the Foreign Relations Law of the United States § 502(1)(b). The United Kingdom is the flag nation here.

Mayagüezanos makes three assertions in response. First, it relies on a provision of the Agreement that provides that certain material subject thereto may be transferred only on a case-by-case consent basis. *See* U.S.-EURATOM Agreement, Agreed Minute, ¶ B.4 ("Retransfers to third countries not included on the lists may be considered on a case by case basis."). That is no response as to materials not covered by the Agreement, such as those involved here.

The second argument suffers from the same flaw. The provisions of Article 8.1(C)(ii) or (iii), concerning the transfer of irradiated nuclear material, simply do not apply to material removed from the Agreement, such as the nuclear waste at issue here.

Mayagüezanos's third argument is that article 5.2 of the Agreement should not be honored because it is inconsistent with § 123 of the Atomic Energy Act, the enabling legislation under which the United States entered the EURATOM Agreement. There are at least three responses. First, there is no conflict. Article 5.2 serves the purpose of the AEA/NNPA to "ensure that the worldwide development of peaceful nuclear activities ... does not contribute to proliferation." S.Rep. No. 95–467, at 3 (1977), *reprinted in* 1978 U.S.C.C.A.N. 326, 328. Second, even if there were ambiguity, we would be guided by the interpretation of the Executive Branch that removing materials that are practically irrecoverable from the operation of the Agreement is consistent with the AEA/NNPA. *See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 119 S.Ct. 662, 671, 142 L.Ed.2d 576 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); *Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982); *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961); *United States v. Lui Kin–Hong,* 110 F.3d 103, 110 (1st Cir.1997) ("[T]he executive branch's construction of a treaty, although not binding upon the courts, is entitled to great weight."). Finally, even if Article 5.2 of the Agreement did conflict with the AEA, this leaves us far from establishing the degree of U.S. control over these shipments necessary to constitute a "major federal action." [13] Neither the treaties nor the AEA/NNPA assign the United States a role, much less control, over this shipment of nuclear waste, and thus there is no "major federal action" under NEPA.

*The Waters*

■ Mayagüezanos maintains as well that the Pacific Swan's passage through U.S. EEZ waters in the Mona Passage activates NEPA's major federal action requirement. The boundaries of the United States extend, by a 1989 Presidential Proclamation,[14] to twelve nautical miles off-

**13.** The Eighth Circuit has said the "major federal action" inquiry involves the separate components of legal control and factual control. *See Goos v. Interstate Commerce Comm'n,* 911 F.2d 1283, 1294 (8th Cir.1990). Without ruling on the correctness of this test, we conclude that the United States has neither legal nor factual control.

**14.** Mayagüezanos refers to the 1982 United Nations Convention on the Law of the Sea (UNCLOS). The Convention has been signed by the President, but it has not yet been ratified by the Senate. Consequently, we refer to UNCLOS only to the extent that it incorporates customary international law, though we also note that the United States "is obliged to refrain from acts that would defeat the object and purpose of the agreement." Restatement (Third) of Foreign Relations Law § 312(3); *see also* Vienna Convention on the Law of Treaties, art. 18 (1969) (reflecting customary international law). Since the United States is not a party to the Vienna Convention, it is not appropriate to rely directly on it, as suggested by the district court, *see Mayagüezanos,* 38 F.Supp.2d at 175 n. 3 (citing *United States v. Royal Caribbean Cruises,* 24 F.Supp.2d 155, 159 (D.P.R.1997)), except insofar as the Convention reflects customary international law. *See Kreimerman v. Casa Veerkamp, S.A. de C.V.,* 22 F.3d 634, 638 n. 9 (5th Cir.1994); Restatement (Third) of Foreign Relations Law, pt. III, introductory note, at 145.

shore, an area called the territorial sea. *See United States v. Ramirez-Ferrer*, 82 F.3d 1131, 1133 (1st Cir.1996) (en banc). Since the distance between Mona Island and the island of Puerto Rico is about thirty-nine miles, there are at least fifteen miles of international waters and twenty-four miles of territorial sea in that part of the Mona Passage that runs between the two islands. *See id.* Under customary international law, the United States has sovereignty and jurisdiction over its territorial seas, subject to the right of innocent passage. *See United States v. Louisiana*, 363 U.S. 1, 34, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960).

 In addition to the territorial seas, the United States has an interest in the two-hundred-mile EEZ. *See* 1 Schoenbaum, *Admiralty and Maritime Law* § 2–16, at 33–36 (2d ed.1994). This case concerns the EEZ, as it is undisputed that the Pacific Swan did not enter U.S. territorial waters. The interests of a coastal state in its EEZ largely have to do with development of natural resources and the availability of scientific research. A coastal state has limited powers in the EEZ under customary international law. As set forth in the Restatement (Third) of the Foreign Relations Law of the United States:

> If the coastal state has clear grounds for believing that a foreign ship has violated applicable international rules, or the supplementary laws or regulations of the coastal state, in the exclusive economic zone, and the ship is not in port but is navigating in the exclusive economic zone or territorial sea of the coastal state, that state may require the ship to give information regarding its identity and its port of registry, its

last and next port of call, and other relevant information required to establish whether a violation has occurred. If a violation has resulted in a substantial discharge causing significant pollution of the marine environment, and the ship has refused to give information or the information supplied is manifestly at variance with the evident factual situation, the coastal state may undertake physical inspection of the ship for matters relating to the violation. If the discharge causes or threatens to cause major damage to the coastline or related interests of the coastal state, or to any resources of its territorial sea or exclusive economic zone, the coastal state may, if the evidence warrants it, institute proceedings including detention of the ship in accordance with its laws.

Restatement (Third) of the Foreign Relations Law § 514, cmt. i. None of the circumstances described in the Restatement is present here, so there is no platform from which to begin to construct an argument that such circumstances could give rise to federal action. Foreign ships do not require the permission of the United States to pass through its EEZ.

Whatever the scope of the United States's potential powers, either multilaterally or unilaterally, over the EEZ, it is clear that the United States has not exercised any such powers with respect to the transport of nuclear waste.[15] Simply stated, the United States has chosen not to regulate shipments of nuclear waste through its EEZ—there is no requirement that it do so, nor is it immediately evident that it would have that authority if it so

---

The United States has taken the position that the twelve-mile territorial sea and the two-hundred-mile EEZ are declarative of customary international law. *See* Proclamation No. 5928, 54 Fed.Reg. 777 (1988); Proclamation No. 5030, 48 Fed.Reg. 10,605 (1983); Statement on United States Oceans Policy, 1983 Pub. Papers 378, 379 (Mar. 10, 1983).

**15.** The district court broadly concluded that the "right of innocent passage," a recognized right under customary international law, meant that the United States could not exercise power over transport of nuclear waste even through its territorial waters. *See Mayagüezanos*, 38 F.Supp.2d at 179. Such a broad analysis is unnecessary to decide this case and we disavow it.

chose.[16] Under these circumstances, there is no major federal action.

## IV

Where this country's multilateral relationships are involved there is a particularly heavy burden on Mayagüezanos to demonstrate a "major federal action" for NEPA purposes, and thus to involve the courts. It has not come close. That is not to say that Mayagüezanos's concerns about the safety of the shipments are frivolous, a matter that we do not judge, only that such concerns should be presented elsewhere.

The grant of summary judgment for defendants is *affirmed.* No costs are awarded.

---

**16.** In 1992, a number of states prohibited the entry into their territorial and EEZ seas of a Japanese-flag ship carrying COGEMA-reprocessed plutonium for use at a Japanese nuclear energy plant. *See* Rothwell, *Navigational Rights and Freedoms in the Asia Pacific Following Entry into Force of the Law of the Sea Convention,* 35 Va. J. Int'l L. 587, 614–15 (1995). The same was true for another shipment in 1995. Other states have requested that the freighters stay out of their territorial and EEZ waters. This case requires no analysis of whether international law is consonant with such actions.